## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

**LAVELL BONE,**                              :

                                             :

      **Plaintiff**                **CIVIL ACTION NO. 3:14-1712**

                                             :

      **v**

                                             :   **(JUDGE MANNION)**

**OFC T. CRAWFORD** *et al.*

                                             :

      **Defendants**

### MEMORANDUM

## I.    Background

Plaintiff, Lavell Bone, an inmate formerly confined[1] in the Special

Management Unit ("SMU") in the United States Penitentiary, Lewisburg,

("USP-Lewisburg"), Pennsylvania, filed the above captioned <u>Bivens</u>[2] action

pursuant to <u>28 U.S.C. §1331</u>. (<u>See</u> Doc. <u>1</u>, complaint). The named

Defendants are Lieutenants Daniel Knapp and Matthew Saylor, Engineering

Technician Randy Bastian, Clinical Director Kevin Pigos, and Special

Investigative Services ("SIS") Technician Tim Crawford. <u>Id.</u> Additionally,

Plaintiff names the "SORT Team Members" as a Defendant. However, the

---

[1]Plaintiff is currently confined in the McCreary United States
Penitentiary, Pine Know, Kentucky.

[2]<u>Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403
U.S. 388, 397 (1971).</u>

waiver of service of summons for these Defendants was returned unexecuted as the Defendants could not be identified as named by the Plaintiff. (See Doc. 21 at 6-7). As such, these Defendants will be dismissed pursuant to Rule 4(m) for Plaintiff's failure to properly identify these Defendants and effectuate service within 120 days of the filing of the complaint. See FED.R.CIV.P. 4(m).

Plaintiff alleges that on September 6, 2012, at approximately 11:30 am, Defendant Bastian, violated his Eighth Amendment rights while escorting Plaintiff to the shower. (Doc. 1, complaint). Plaintiff claims that he asked Defendant Bastian if he would call the mental health department for Plaintiff to speak to a psychologist because he was "hearing voices in [his] head and that the voices were telling [him] to kill [himself]." Id. While placing Plaintiff in the shower, Defendant Bastian told him he would call the mental health department for him. Id. Plaintiff claims that on his way out of the shower, he once again asked Defendant Bastian if he could call the mental health department for Plaintiff and Bastian responded that he would call once Plaintiff went back inside his cell. Id. Plaintiff, however, stated that he "couldn't go back inside [his] cell." Id. At this point, Defendant Bastian asked Plaintiff if he was refusing to go back to his cell. Id. Plaintiff responded that he was not refusing, but that he has mental health issues that he takes medicine for, because he hears voices in his head telling him to kill himself. Id. Defendant

Bastian then responded "so you're threatening me" and Plaintiff then told him the he was "not threatening him". Id. Plaintiff states that "after he seen where Officer Bastian was going with this situation" he then "tried to explain [his] situation to Officer Bastian. Id. Plaintiff states that he told Defendant Bastian that "this was a life and death situation" in that "the voices told [him] they were going to kill [him] if [he] went back into that cell." Id. Plaintiff claims that Defendant Bastian left him in the shower, while he claimed to go and call the Mental Health Department. Id. However, instead of getting the Mental Health Department, Defendant Bastian returned with Defendant Crawford. Id. Officer Crawford asked Plaintiff if he was "refusing to go back to [his] cell because of the threats this officer made to [him] a week before this incident." Id. When Plaintiff refused to answer, Plaintiff claims Crawford "walked out of the shower area and returned shortly with an empty milk carton in his hand". Id. He looked at Plaintiff and said that Plaintiff "was going to need this, holding the milk carton up for [Plaintiff] to see". Id. Crawford then threw the milk carton on the floor in front of the shower Plaintiff was in and walked out of the shower area. Id. Plaintiff claims that while still sitting in the area waiting for either the Mental Health Department or Defendant Bastian to return, the Sort Team came to the shower and put Plaintiff in restraints. Id. When Plaintiff inquired as to the need for restraints, he was told it was because he "threw piss on

them". Id.

On September 2, 2014, Plaintiff filed the instant action in which he alleges that he was wrongfully issued a misconduct report on September 6, 2012 and wrongfully held in restraints from September 6 through September 8, 2012. Id. During his time in restraints, Plaintiff claims to have been denied medical attention, access to the bathroom, and access to water. Id. He states that he "had urine and feces on [him] for two days' and "because Lt. Knapp wouldn't give [him] any water, [he] had to get on [his] knees and drink water out of the toilet." Id. For relief, Plaintiff seeks compensatory and punitive damages in the amount of 5.9 million dollars. Id.

Presently before the Court is Defendants' motion for summary judgment or, in the alternative, motion to dismiss. (Doc. 22). The motion has been fully briefed and is ripe for disposition. For the reasons that follow, Defendants' motion for summary judgment will be granted.

## II.   Standards of Review

### A. Bivens Standard

Plaintiff's claims are filed pursuant to 28 U.S.C. §1331, in accordance with Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, (1971). Under Bivens, the District Court has federal question

jurisdiction pursuant to 28 U.S.C. §1331 to entertain an action brought to redress alleged federal constitutional or statutory violations by a federal actor. Bivens, supra. Pursuant to Bivens, "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978). A Bivens-style civil rights claim is the federal equivalent of an action brought pursuant to 42 U.S.C. §1983 and the same legal principles have been held to apply. See, Paton v. LaPrade, 524 F.2d 862, 871 (3d Cir. 1975); Veteto v. Miller, 829 F.Supp. 1486, 1492 (M.D.Pa. 1992); Young v. Keohane, 809 F.Supp. 1185, 1200 n. 16 (M.D.Pa. 1992). In order to state an actionable Bivens claim, a plaintiff must allege that a person has deprived him of a federal right, and that the person who caused the deprivation acted under color of federal law. See West v. Atkins, 487 U.S. 42, 48 (1988); Young v. Keohane, 809 F.Supp. 1185, 1199 (M.D.Pa. 1992); Sharpe v. Costello, 2007 WL 1098964, *3 (M.D.Pa., 2007).

## B. Motion to Dismiss

Defendant's pending dispositive motion is supported by evidentiary materials outside the pleadings. Federal Rule of Civil Procedure 12(d) provides in part as follows:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleading are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given reasonable opportunity to present all the material that is pertinent to the motion.

Fed.R.Civ.P. 12(b)(d).

This Court will not exclude the evidentiary materials accompanying the Defendant's motion. Thus, the motion will be treated as solely seeking summary judgment. See Latham v. United States, 306 Fed. Appx. 716, 718 (3d Cir. 2009) (when a motion to dismiss has been framed alternatively as a motion for summary judgment such as in the present case, the alternative filing "is sufficient to place the parties on notice that summary judgment might be entered.")

## C. **Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(a) "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no

genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion

is unsupportable by admissible evidence. Fed.R.Civ.P. 56(c)(1); see Celotex, 477 U.S. at 324 (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U .S. at 323; see Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed.R.Civ.P. 56(e).

### III.   **Statement of Facts**

From the pleadings, declarations and exhibits submitted therewith, the following facts can be ascertained as undisputed.

On April 22, 2010, Lavell Bone was sentenced in the United States

District Court for the Northern District of Georgia to a 461 month term of incarceration for Armed Bank Robbery and Use of a Firearm During a Crime of Violence, in violation of 18 U.S.C. §§2113(a) and (d), 1951, and 924(c)(1)(A)(ii). (Doc. 33-1 at 8-9, Public Information Inmate Data).

From October 26, 2009 through December 22, 2014, while housed in the SMU at USP-Lewisburg, Bone has been sanctioned twenty-five times for inter alia, incidents of engaging in sexual acts, threatening bodily harm, mail abuse, destroying property, disruptive conduct, indecent exposure, possessing a dangerous weapon and refusing to obey orders. (See Doc. 33-1 at 48-56, Inmate Discipline Data Chronological Disciplinary Record).

On September 6, 2012, Plaintiff was issued two incident reports. Id.

Incident Report No. 2347875, issued by Lieutenant Saylor, charged Bone with Threatening Another with bodily harm and Refusing an order, in violation of Codes 203 and 307, respectively. (Doc. 33-1 at 116, Incident Report No. 2347875). The Incident Report stated the following:

> On September 6th, 2012, at approximately 12:05 p.m., inmate Bone, L #60154-019 was located in the shower of G-Block. I was approaching the area to speak with the inmate when the inmate began to threaten staff by stating "Come on over here motherfucker and get some of this piss". Due to the inmate striking the Officer minutes earlier with an unknown liquid it was unsafe to approach the shower area for myself and other staff. I ordered the inmate to show me his hands and stop threatening

> staff to which he responded "Go fuck yourself, come closer dickhead". I then gave the inmate a second order to which he refused to respond.

Id.

Officer Crawford wrote Incident Report No. 2347876, charging Bone with the prohibited act of Assault, a violation of Code 224. (Doc. 33-1 at 67, Incident Report). He described the incident as follows:

> On the above date at 12:00 pm, I had entered the 3 floor shower area to escort I/M Bone #60154-019 back to his assigned cell. After I had taken the lock off the wicket to restraint I/M Bone #60154-019 he threw an unknown substance. The substance hit this writing officer in the neck and chest area.

Id. Both incident reports were delivered to Bone on September 6, 2012, at 1:00 p.m. Id. at 67, 116. Incident report No. 2347875, issued by Lieutenant Saylor, was ultimately expunged because the same facts gave rise to the other incident report issued by Crawford for Assault. (Doc. 33-1 at 114, Declaration of M. Saylor at ¶4). Incident Report No. 2347876, issued by Officer Crawford was suspended pending referral for prosecution. (Doc. 33-1 at 62, Discipline Hearing Officer Report).

After being assaulted with the liquid substance, Officer Crawford removed himself from the area and notified the G-Block Lieutenant. (See (Doc. 33-1 at 115, Memorandum of Lt. Saylor; Doc. 33-1 at 110,

10

Memorandum of Lt. Knapp). Defendant Saylor reported to the block in an attempt to speak with Bone, however, as he approached the shower area, Bone stated, "come over mother fucker and get some of this piss." Id.  When Defendant Saylor ordered Bone to show him his hands and cease his actions, Bone continued to threaten staff verbally and to display signs of imminent violence towards staff. Id.  The Warden was then notified of Bone's disruptive behavior, his assault on staff, and his continued threats towards staff. ((Doc. 33-1 at 10-13, Form 583 Report of Incident). The Warden authorized staff to immediately place Plaintiff into ambulatory restraints due to his continued disruptive behavior and the fact he could not be approached by staff in a safe manner. Id.

At approximately 12:51 p.m., a use of force team was assembled to conduct a calculated use of force. (Doc. 33-1 at 10-13, Form 583 Report of Incident). At approximately 12:51 p.m., Defendant, Lieutenant Knapp conducted a debriefing video concerning the calculated use of force on Bone. (Doc. 24, Video (sealed document)). During the videotaped debriefing conducted on September 6, 2012, prior to the calculated use of force, the following information was provided by Defendant Knapp:

> "My name is Lieutenant Knapp. The date is September 6, 2012."…. "[W]e are currently in the Special Management Unit,

specifically G-Block, of the USP Lewisburg, due to inmate Bone, first name Lavell, Register No. 60154-019, for engaging in disruptive behavior, displaying signs of imminent violence, and assaulting staff. Specifically, at approximately 12:00 p.m., the G-Block Officer entered the shower area of the third floor of G-Block, inmate Bone threw an unknown liquid substance from a milk carton at the Officer, striking the Officer on the side of the upper body and face. The liquid substance had a distinct odor of urine. The Officer then notified the Lieutenant's office. When the Lieutenant arrived on the third floor shower area, the inmate began to make threatening statements at the Lieutenant, stating "come on, mother fucker, come get some more piss." Inmate Bone is a 29 year old black male with STG assignments of assaulting a correctional officer, history of arson, and posted picture filing. He has an extensive disciplinary history to include possession of a weapon, refusing orders and indecent exposure. He is an in-custody high security level inmate with a projected release date of March 2042. Warden Thomas has been briefed of the situation and has given authorization to assemble a Use of Force team to place inmate Bone into ambulatory restraints due to his disruptive behavior, displaying signs of imminent violence, and assaulting staff. The Warden has also authorized the use of chemical munitions in the event that inmate Bone refuses to submit to ambulatory restraints or becomes combative during the placement into ambulatory restraints. In the event that chemical agents are utilized, inmate Bone's medical record has been reviewed and the use of chemical agents is authorized. If chemical agents are utilized, we will decontaminate the inmate in the G-Block third floor shower area …

Id. The video then continues with the use of force team proceeding to the shower area and alerting Plaintiff of the impending calculated use of force. Id. The video reveals Plaintiff agreeing to cooperate with the team and placing his hands through the slot in the door to be handcuffed. Id. Once restrained,

Plaintiff is removed from the shower, visually searched, metal detected, placed in new clothes, and placed in ambulatory restraints. Id. Once secured, Plaintiff was photographed. Id. The team then escorted Plaintiff to the first floor, G-Block, where, while still in restraints, he was placed in Cell No. 126. Id. He was then covered with a blanket without further incident. Id.

Following the use of force and application of restraints, health services staff performed an injury assessment of Plaintiff. (Doc. 33-1 at 119, Health Services Clinical Encounter). No significant findings or apparent distress was noted. Id. It was noted that the ambulatory restraints were applied appropriately so as to permit adequate blood flow to the inmate's extremities, and that Plaintiff sustained no injuries and offered no chief complaint. Id. The use of force concluded at approximately 1:08 p.m. (Doc. 24 video, (sealed document)).

Plaintiff remained in restraints until 6:00 p.m. on September 8, 2012. (Doc. 33-1 at 27, Restraint Check Form). While housed in restraints in G-Block first floor cell #126, Plaintiff was checked methodically by staff pursuant to Program Statement 5566.06, Use of Force and Application of Restraints. (Doc. 33-1 at 169-191, Program Statement 5566.06; 28 C.F.R. §552.24.48. BOP policy authorizes staff "to apply physical restraints

necessary to gain control of an inmate who appears to be dangerous because the inmate: (a) Assaults another individual; (b) Destroys government property; (c) Attempts suicide; (d) Inflicts injury upon self; or (e) Becomes violent or displays signs of imminent violence." Id. at §1; 28 C.F.R. §552.20. BOP policy provides that "[r]estraints should remain on the inmate until self-control is regained." Id. at 7, §6(f); 28 C.F.R. §552.22 (f).

BOP policy provides that "[r]estraint equipment or devices (e.g. handcuffs) may not be used … [i]n a manner that causes unnecessary physical pain or extreme discomfort." Id. at 7, §6(h)(3); 28 C.F.R. §552.22(h)(3). BOP policy provides that "[i]n general, when applying restraints, staff will use sound correctional judgment to ensure unnecessary pressure is not applied to the inmate." Id. at 7, §6(h)(3), ¶1. BOP policy directs that, for inmates in ambulatory restraints[3], "[s]taff shall check the inmate at least every 15 minutes, both to ensure that the restraints are not hampering circulation and for the general welfare of the inmate …." Id. at 12, §10(d); 28 C.F.R. §552.24(d). Two-hour scheduled lieutenant checks are also

---

[3]"Ambulatory restraints are defined as approved soft and hard restraint equipment which allow the inmate to eat, drink, and take care of human basic needs without staff intervention." (Doc. 33-1 at 169-191, Program Statement 5566.06 at 11, §9; 28 C.F.R. §552.24.48.

required for inmates placed in ambulatory restraints. Id. at 11, §9 ("The policies and procedures described in Sections 10 and 13 of this Program Statement will be followed for inmates placed in …(ambulatory restraints)." BOP policy directs that, "[a] review of the inmate's placement in four-point restraints shall be made by a Lieutenant every two hours to determine if the use of restraints has had the required calming effect and so that the inmate may be released from these restraints (completely or to lesser restraints) as soon as possible." (Doc. 33-1 at 169-191, Program Statement 5566.06 at 13, §10(e); 28 C.F.R. §552.24(e). Also, BOP policy directs that "[a]t every two-hour review, the inmate will be afforded the opportunity to use the toilet, unless the inmate is continuing to actively resist or becomes violent while being released from the restraints for this purpose." Id.

Additionally, BOP policy directs that, "[w]hen the inmate is placed in four-point restraints, qualified health personnel shall initially assess the inmate to ensure appropriate breathing and response (physical or verbal) and "shall also ensure that the restraints have not restricted or impaired the inmate's circulation." (Doc. 33-1 at 169-191, Program Statement 5566.06 at 14, §10(f); 28 C.F.R. §552.24(f)). Specifically, "[w]hen inmates are so restrained, qualified health personnel ordinarily are to visit the inmate at least twice

during each eight hour shift." (Doc. 33-1 at 169-191, Program Statement 5566.06 at 14, §10(f); 28 C.F.R. §552.24(f). BOP policy directs that, "[u]se of four-point restraints beyond eight hours requires the supervision of qualified health personnel. Mental health and qualified health personnel may be asked for advice regarding the appropriate time for removal of the restraints." Id. Medical and mental health checks are also required for inmates placed in ambulatory restraints. Id. at 11, §9 ("The policies and procedures described in Sections 10 and 13 of this Program Statement will be followed for inmates placed in …(ambulatory restraints)."

Finally, BOP policy directs that "within 24 hours of placement in restraints, a review of the inmate's status will be conducted" by the Warden, Associate Warden, Captain, Unit Manager, Health Services Administrator, and Chief Psychologist "and a behavior management plan prepared." (Doc. 33-1 at 169-191, Program Statement 5566.06 at 15, §10(g); 28 C.F.R. §552.24(g).

In accordance with BOP policy, the extensive record in this action reveals the following with respect to restraint and medical checks:

## A. **Fifteen Minute Restraint Checks**

Fifteen-minute restraint checks were completed in accordance with

16

policy, starting at 1:15 p.m. on September 6, 2012, and continuing until 6:00 p.m. on September 8, 2012. (Doc. 33-1 at 14-21 Fifteen Minute Restraints Check Form). The record reveals that Plaintiff used foul language and made threatening remarks for the majority of the 128 fifteen minute checks. Id.

### B. Two-Hour Restraint Checks

The record reveals that consistent two-hour lieutenant checks were completed in accordance with BOP policy from 2:00 p.m. on September 6, 2012, until 2:00 a.m. on September 8, 2012. (Doc. 33-1 at 22-26, Two-hour Lieutenant Restraints Check Form). The two-hour lieutenant checks were delayed on September 8, 2012 until 6:15 a.m., when a recall of staff could be performed and a second Lieutenant could conduct the two-hour lieutenant checks due to the Morning Watch Operations Lieutenant having been seriously assaulted by an inmate. (Doc. 33-1 at 41-42, Memorandum explaining delay and Two-hour Lieutenant Restraints Check Form). During the delay of the two-hour lieutenant checks, the fifteen minutes checks were conducted accordingly. (Doc. 33-1 at 10-11, Fifteen Minute Restraints Check Form). The two-hour lieutenant checks were resumed in accordance with policy from 6:15 a.m. on September 8, 2012, until 6:00 p.m. on September 8, 2012. (Doc. 33-1 at 27, 42, Two-hour Lieutenant Restraints Check Form).

17

Additionally, in accordance with BOP policy, the record reveals that the use of the toilet was available during each two-hour check but not used. (Doc. 33-1 at 22-27, Two-Hour Lieutenant Restraints Check Form).

During the first twenty-four hours of two-hour lieutenant restraint checks, the record shows the following statements were made by Plaintiff: "I'll show you. I'll get you motherfuckers when you least expect it." (Doc. 33-1 at 22, Two-Hour Lieutenant Restraints Check Form); "That staff member had it coming. I'll do it again if I get a chance." Id.; "I'm good, get the fuck out of my cell. I don't need you to check this shit." Id. 23); "This shit ain't going to break me. Just get the fuck out of my cell." Id.; "You [ ] bitch, you. Remember this day. Just wait." Id. at 24; "Fuck you officer, I'll shit him down next time." Id. at 25; "This is gonna get worse before it gets better." Id. at 26; "All you assholes can go fuck yourself." Id. at 42; "Get the fuck out of here bitch." Id. at 27.

Defendant, Lieutenant Knapp, checked Plaintiff's restraints on September 6, 2012, at 2:00 p.m., and on September 7, 2012, at 8:00 a.m., 10:00 a.m., 12:00 p.m. and 2:00 p.m. (Doc. 33-1 at 22, 24-25, Two Hour Lieutenant Restraints Check Form). Plaintiff maintained a defiant and aggressive behavior during each of Lieutenant Knapp's restraint checks. Id.

Defendant, Lieutenant Saylor, checked Plaintiff's restraints on

18

September 8, 2012, at 6:15 a.m. and 8:00 a.m., both times Plaintiff continued to display aggressive behavior. Id. at 42.

Bone's behavior remained "poor," "defiant," and "agitated," until September 8, 2013, during the 4:00 p.m. lieutenant restraint check, when he displayed signs of "beginning to "follow staff's verbal orders" and it was recommended he "be reevaluated on next check." Id. at 27. At 6:00 p.m. on September 8, 2012, the two-hour lieutenant checks note "calming effect achieved" and Plaintiff was removed from the ambulatory restraints. Id.

## C. Health Services Restraint Checks

The medical records and video reveal that Emergency Medical Technician ("EMT") Matthew Barth was present when the restraints were initially placed on Plaintiff on September 6, 2010, and that he medically assessed him at this time. (Doc. 24, video (sealed document); Doc. 33-1 at 119-120, Health Services Clinical Encounter). On September 10, 2012, Defendant, Dr. Pigos co-signed EMT Barth's entry in Bone's medical record. (Doc. 33-1 at 121).

Once placed in restraints, the record reveals that Plaintiff was routinely checked by medical and psychology staff pursuant to BOP policy. (See Doc. 33-1 at 28-34, Health and Psychology Restraint Review Forms; Doc. 33-1 at

119-157, Bureau of Health Services Clinical Encounters).[4] At no time did he offer any medical complaint. Id. Moreover, during each of the thirteen medical restraint checks, staff noted that Bone's consumption of food or liquid was adequate or available. Id.

On September 6, 2012, during the first restraint check at 4:00 p.m., staff loosened the martin chain around Bone's chest and noted the restraints moved freely to allow Bone to perform activities of daily living such as eating, drinking, and using the toilet. (Doc. 33-1 at 156, Health Services Clinical Encounter). During the 8:00 p.m. restraint check on September 6, 2012, the cuffs were found on Bone's forearms, moved to their proper position on the wrists and loosened slightly due to swelling. (Doc. 33-1 at 152, Health Services Clinical Encounter). Medical staff advised Plaintiff to keep the cuffs low on his wrists to prevent swelling and/or tissue damage, metabolic disturbance, coma, or death. Id.

On September 7, 2012, at 12:01 a.m., Plaintiff's handcuffs were again found on his forearms and moved to the proper position on his wrists. Id. at 149.  Medical staff again advised Plaintiff to keep the cuffs low on his wrists

---

[4]It is noted that after the initial placement, none of the Defendants conducted the medical restraint checks on Plaintiff. Id.

to prevent swelling and/or tissue damage, metabolic disturbance, coma, or death. Id. Bone offered no medical complaints. Id. At 7:45 a.m., health personnel arrived to perform restraint checks and noted that "inmate having breakfast when I arrived." Id. at 146. During the 9:00 a.m. medical assessment conducted on September 7, 2012, medical staff noted Bone's "hands swollen secondary to I/M forcing the wrist restraints up his forearms" and moved the restraints to the wrists where they moved freely. Id. at 143. Bone stated he "does not believe he should be back at the SMU and is not going to allow anybody to remove the restraints for at least a week because it will get him noticed." Id. Bone further stated, "I choose when I go into restraints and I choose when I come out." Id. Bone was advised to keep the restraints at his wrists. Id. at 144. During the 12:00 p.m. medical assessment on September 7, 2012, Bone voiced no medical complaints but it was noted that his hands were swollen secondary to him refusing to keep restraints at his wrists. Id. at 140. The restraints were adjusted and moved to Plaintiff's wrists and he was again advised to keep the restraints at his wrists. Id. Plaintiff complied with the restraint check but became agitated and verbally aggressive towards the operations lieutenant and custody staff when they attempted to talk to him about removal from restraints. Id. At the 4:00 p.m.

restraint check on September 7, 2012, swelling and minor abrasions were noted on Plaintiff's left and right wrists. Id. at 138. Bone was again educated on proper restraint placement but he continued to manipulate the restraints. Id. At the 6:00 p.m. restraint check on September 7, 2012, staff noted that they were "unable to perform wound care, inmate uncooperative." Id. at 135.

On September 8, 2012, during restraint checks at 6:15 a.m. and 8:00 a.m., the bilateral restraints were located on Plaintiffs' forearms and his right hand and wrist were "swollen secondary to improper restraint placement." Id. at 125, 129. Staff also noted three wounds to the right posterior forearm with open skin and scab around the edges. Id. Bone was again warned that "improper restraint placement can lead to further injuries such as continued skin breakdown, infection, necrosis, circulatory compromise, nerve damage, loss of limbs and even death." Id. At the 6:15 a.m. check, staff was able to move the left restraint back at the wrist where they moved freely "and explained that the same thing will happen to the left arm as the right if he continues with improper restraint placement." Id. at 129. At the 8:00 a.m. check, Plaintiff refused to let staff place the left restraint back at the wrist, though mild swelling was noted to the left forearm/hand. Id. at 126. At the 10:00 a.m. check, the restraints were again located on Plaintiff's already open

wounds on the forearms. Id. at 123. Staff attempted to place the restraints back at the wrist but Bone refused to allow it, stating "they are more comfortable where they are." Id. Medical staff "[e]xplained the risk for infection, necrosis, continued tissue damage, potential loss of limbs and death." Id. Plaintiff stated he understood all the risks but stated the "restraints are more comfortable on his open wounds than in their proper location." Id. Medical staff noted that the wounds on Bone's right arm "are seeping serous fluids" and would be cleaned and bandaged at the next check. Id.

During various times over the course of Plaintiff's restraint checks, medical staff entered the following notes on the Health Services Restraint Form: "patient offered no medical complaints," "mild swelling to right hand," "cuffs moved to proper position on wrists," Inmate counseled to "keep the restraints at the wrists," "Martin chain loosened for comfort," "No signs of trauma or dehydration noted," "Good distal pulses in all Extrem…," "I/M s hands swollen secondary to I/M refusing to keep restraints at the wrist," "Restraints adjusted and moved to wrists," "the inmate has minor abrasions noted to the wrists," "Restraints again located on IM already open wounds on the forearms," "Attempted to place restraints back at the wrist but IM refused to allow stating they are more comfortable where they are," Restraints:

"adequate/good/normal," Inmate use of toilet: "available," and Overall Assessment of Inmate Health: "appears healthy/appears well/fine," (Doc. 33-1 at 28-32, Health Services Restraint Review Form).

On September 8, 2012, Plaintiff was removed from restraints at 6:00 p.m.[5] He was seen by medical staff on September 10, 2012, within two days of his removal from restraints, but made no complaints of injuries and no injuries were noted. (Doc. 33-1 at 162, Health Services Clinical Encounter).

On September 11, 2012, Bone was seen by Defendant, Dr. Pigos, for a chronic care appointment. (Doc. 33-1 at 158, Health Services Clinical Encounter). His only complaint at this visit was that "he has been hearing more voices for some time". Id. Bone made no complaints of injuries to his arms during his appointment with Dr. Pigos. Id.

## D. **24 Hour Restraint Check**

On September 7, 2012, at 1:00 p.m., a 24-hour restraint review was conducted in accordance with BOP policy. (Doc. 33-1 at 33-37, 24 Hour Restraint Review). The 24-hour restraint review revealed that, according to

---

[5]The record demonstrates that Dr. Pigos subsequently reviewed and co-signed each entry by medical staff during the time Bone was in ambulatory restraints. (Doc. 33-1 at 121, 124, 127, 130, 133, 136, 139, 142, 145, 148, 151, 154, 157.

numerous fifteen-minute checks, Bone was "showing no indications of cooperating with staff or engaging in positive communication." Id. at 36. It is noted that during the fifteen-minute checks Bone stated "you mother fuckers are as fucked up as your bosses." Id. The 24-hour restraint review revealed that, according to two-hour checks, Bone was "not displaying a desire to have restraints removed, and is ignoring staff efforts to encourage him to program." Id. The 24-hour restraint review noted that, during several of the previous restraint checks, "Bone was very agitated and argumentative with the Lieutenant. Once the Lieutenant secured the door the inmate kicked it and stated he would assault him if the restraints were removed." Id. It was noted that Bone was "continuing his disruptive and uncooperative actions" and was "displaying a poor attitude." Id. The 24-hour restraint review by the Chief Psychologist noted "Bone is viewed as disruptive and not a mental health concern. His current behavior should be viewed as a correctional issue, until he is willing to cooperate. A referral to a mental health institution is not warranted at this time." Id. at 37. Bone's current mental health status was described as follows:

> "Despite insistence on hearing voices, listening to voices, and responding to voices, this inmate is thinking rationally, purposefully, in an effort to avoid responsibility for his actions. There is little indication he has a decompensated mental status."

Id. at 33. The 24-hour restraint review by the Health Services Administrator noted that "restraint checks were conducted with no signs of circulation impairment." Id. at 37. As a result of the fifteen-minute check log, the lieutenant two hour check log, medical staff log, and the psychology service check logs, it was recommended by the review panel that Bone be kept in restraints. Id. at 36.

### E. **48-Hour Restraint Check**

On September 8, 2012, at 4:30 p.m., a 48-hour restraint review was conducted in accordance with BOP policy. (Doc. 33-1 at 38-40, 48 Hour Restraint Review). The 48-hour restraint review revealed that, according to numerous fifteen-minute checks, Bone was "showing no indications of cooperating with staff or engaging in positive communication." Id. at 39. The 48-hour restraint review revealed that, according to two-hour checks, Bone was "not displaying a desire to have restraints removed, and is ignoring staff efforts to encourage him to program." Id. The 48-hour restraint review noted that, during several of the previous restraint checks, Bone "continued with his disruptive behavior." Id. It was noted on the 48-hour restraint review that Bone was "continuing his disruptive and uncooperative actions" and was "displaying a poor attitude." Id. The 48-hour restraint review by the Chief Psychologist

again noted Bone being "viewed as disruptive and not a mental health concern. His current behavior should be viewed as a correctional issue, until he is willing to cooperate. A referral to a mental health institution is not warranted at this time." Id. at 40. Bone's current mental health status was described as "stable" and demonstrating "no overt evidence of active psychosis or psychological distress." Id. at 34. The 48-hour restraint review by the Health Services Administrator noted that "restraint checks were conducted with no signs of circulation impairment." Id. As a result of the fifteen-minute check log, the lieutenant two hour check log, medical staff log, and the psychology service check logs noted on the 48-hour restraint review, the review panel recommended to keep Bone in restraints. Id. at 39.

On October 24, 2012, Incident Report No. 2347876, issued by Officer Crawford was released for processing.  (Doc. 33-1 at 62, Discipline Hearing Officer Report).

On October 25, 2012, Plaintiff appeared before the Unit Disciplinary Committee ("UDC"), who recommended that "to change negative behavior" the misconduct be heard by a Discipline Hearing Officer ("DHO"). (Doc. 33-1 at 67, Incident Report).

On December 3, 2012, Bone appeared before the DHO, where he was

found guilty of the prohibited act of Assault. (Doc. 33-1 at 58, Appeal Response).

On December 19, 2012, Plaintiff filed an appeal from his misconduct hearing, arguing that he had been denied due process with respect to a choice of personal representative. (Doc. 33-1 at 57, Regional Administrative Remedy Appeal No. 717457-R1).

By Response dated January 30, 2013, the Regional Director partially granted Plaintiff's appeal as follows:

> You appeal the December 3, 2012, decision of the Discipline Hearing Officer (DHO) at USP-Lewisburg finding you committed the prohibited act of Assault, Code 224, Incident Report No. 2347876. You argue you were denied your staff representative. You request the report be expunged.
>
> A review of your appeal reveals questions concerning the disciplinary process. Accordingly, this disciplinary action is being remanded for further review and rehearing, if necessary. You will be notified of the date and time of further proceedings. After further proceedings, you may appeal again to this office, if you desire. Your appeal is partially granted.

(Doc. 33-1 at 58, Appeal Response).

On April 3, 2013, the DHO conducted a rehearing regarding the charge of assault against Bone. (Doc. 33-1 at 60-65, Discipline Hearing Officer Report on Rehearing). As a result of the rehearing the following Administrative Note was added to the DHO Report:

This DHO Report is a result of an administrative appeal by inmate Bone, in order to further address witness and staff representative concerns in this case. The remainder of the DHO report remains unchanged. At the time of the DHO hearing of 12-03-2012, inmate Bone requested Dr. Karpen as a witness in this case after a decision was rendered by the DHO. On 03-08-2013, Dr. Karpen appeared before the DHO, and submitted a witness statement in this case. The DHO asked Dr. Karpen if he told Bone he would submit a statement that Bone was depressed, and Dr. Karpen stated that he never spoke to the inmate Bone about the incident, or about his purported depression. Dr. Karpen stated that he was not a direct eyewitness to inmate Bone's commission of the prohibited act in this case. When questioned by the DHO as to whether or not he would like to be a character witness for inmate Bone, Dr. Karpen stated that he does not wish to submit a character witness statement in regard to inmate Bone. Dr. Karpen added he is not aware of any mental defect that would preclude inmate Bone from being held responsible for his commission of the prohibited act in this case. Concerning inmate Bone's request for a staff representative in this case, on 03-04-2013, counselor J. Diltz asked inmate Bone to select a staff representative for this rehearing, and inmate Bone requested J. Criswell as a staff representative in this case. On 03-08-2013, after speaking with Mr. Criswell prior to the DHO hearing for inmate Bone, it was discovered officer Criswell was a witness in this case. Specifically, it was discovered officer Criswell was in the staff office adjacent to the shower where inmate Bone assaulted staff by throwing an unknown liquid substance on staff, and responded to the incident when the officer called for assistance. Unbeknownst to the DHO, officer Criswell was discovered to be significantly involved in the incident, and therefore could not be a staff representative in this case. On 03-08-2013, the DHO hearing was deferred after inmate Bone was informed by officer Criswell to request another staff representative. On 03-20-2013, inmate Bone requested Dr. D. Mink as a staff representative in this case. Dr. Mink declined to be a staff representative in this case due to a "conflict of interest". On 03-27-2013 Mr. Maietta was appointed as staff representative in this case. Prior to the DHO hearing, Mr. Maietta interviewed

inmate Bone. Mr. Maietta stated inmate Bone requested video of the incident, after which time Mr. Maietta informed Bone that video was not available, as Bone was previously informed. Mr. Maietta appeared as a staff representative on behalf of inmate Bone during the DHO hearing. Mr. Maietta stated he had no first hand knowledge of the incident to make, regarding this case. Mr. Maietta stated he had no further information to present, nor statement to make, regarding this case. The DHO notes the processing of this incident report was suspended pending referral to the VI/AUSA for possible prosecution on 09-06-2012. The incident report was released for processing on 10-24-2012, at which time disciplinary proceedings resumed. The incident report was investigated on 10-24-2012, and the UDC hearing was conducted on 10-25-2012, following release of the incident report by the FBI-AUSA for processing at the institution, Inmate Bone made no complaint of the timeliness of the investigation of the incident report, nor the timeliness of the UDC hearing. The DHO notes that the delay in the processing of this incident report, as a result of the suspension, did not infringe upon inmate owns (sic) due process rights, nor did it impede his ability to defend himself against charges. End of note.

(Doc. 33-1 at 62, Discipline Hearing Officer Report on Rehearing).

At the conclusion of the hearing, the DHO determined Bone committed the prohibited act of Assaulting Any Person, in violation of Code 224. Id. at 64. The DHO imposed the following sanctions: loss of 27 days good conduct time (GCT), 30 days Disciplinary Segregation (DS), and four months loss of commissary, telephone, and visiting privileges. Id. The charges and sanctions imposed in connection with Incident Report No. 2347876 remain valid on Plaintff's disciplinary record. (See Doc. 33-1 at 52, Inmate Discipline Data

Chronological Disciplinary Record).

## IV.   <u>Discussion</u>

### A.   <u>Eighth Amendment Excessive Force Claims</u>

As the United States Court of Appeals for the Third Circuit has

observed:

> The Eighth Amendment protects against infliction of "cruel and unusual punishment." However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." Whitley v. Albers, 475 U.S. 312, 319 (1986). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Id. (citation and internal quotations omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Id.

> Resolution of an Eighth Amendment claim therefore "mandate[s] an inquiry into a prison official's state of mind." Wilson v. Seiter, 501 U.S. 294, 299 (1991). Two considerations define that inquiry. We must first determine if the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections. Id. at 298. If not, our inquiry is at an end. However, if the deprivation is sufficiently serious, we must determine if the officials acted with a sufficiently culpable state of mind. Id. In other words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain. "What is necessary to establish an 'unnecessary and wanton infliction of pain ...' varies according to the nature of the alleged constitutional violation." Hudson v.

McMillian, 503 U.S. 1, 5 (1992).

Fuentes v. Wagner, 206 F.3d 335, 344-45 (3d Cir. 2000).

An Eighth Amendment excessive force claim entails a showing of some subjective intent to injure. In an excessive force case, where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley [v. Albers, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).

Thus, the keystone to analysis of an Eighth Amendment excessive force claim often entails issues of motivation–whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). However, the issue of whether excessive force was used is one which, in proper circumstances, can be determined as a matter of law. In such cases, summary judgment is appropriate when "it appears that the evidence, viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 322). There are several factors that

a court examines in determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, including: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" Id. at 106.

When considering such claims, the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.", 490 U.S. 386, 396-7 (1989). Moreover, in the context of prison excessive force claims, in determining "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Hudson v. McMillian, 503 U.S. 1, 6-7 (1992), "even if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that he caused. . . , any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.'" Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000).

Further, in the specific factual context of excessive force claims based upon allegations relating to a prisoner's handcuffing, courts have acknowledged that, in certain instances, government officials are entitled to qualified immunity as a matter of law. Gilles v. Davis, 427 F.3d. 197, 207 (3d Cir. 2005). With respect to these particular excessive force claims, the test for qualified immunity can be simply stated: "In these cases, summary judgment for an officer who claims qualified immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " Id.

In their motion for summary judgment, the Defendants have provided ample evidence to demonstrate that the ambulatory restraints applied to Bone were applied in a good-faith effort to restore discipline. Exhibits document Bone's history of disciplinary infractions at the prison for violent behavior, and the incident that triggered the use of restraints in the instant action involved misconduct that threatened staff safety. It is clear that the temporary restraints were necessary to limit the threat to staff and to allow Bone to regain his composure. The Defendants also submitted evidence of the 15–minute and 2–hour checks that were regularly conducted to examine and adjust the fit of the restraints, and to evaluate Bone's level of self-control. Furthermore, the

Defendants have demonstrated that the use of restraints was narrowly tailored; once Bone was finally calm and the threat against staff had subsided, the restraints were removed. Thus, the Defendants successfully made their showing.

The burden then shifted to Bone to produce sufficient evidence from which a reasonable jury could find that the restraints were applied not to restore discipline, but rather to cause him pain. See Padillas v. Stork–Gamco, Inc., 186 F.3d 412, 414 (3d Cir. 1999). Aside from the mere reiteration of the factual allegations already contained in the original complaint, Plaintiff produces no exhibits, declarations or affidavits to counter Defendants' voluminous exhibits in support of summary judgment. To the extent that Bone's pleadings are rife with conclusory assertions that the restraints were maliciously too tight, the simple repetition of this phrase does not demonstrate its truth. See Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009) ( "[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment."). The Third Circuit has held that "[s]ummary judgment in favor of a defendant is not appropriate if it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." Brooks v.

Kyler, 204 F.3d 102, 106 (3d Cir. 2000). Because the evidence will not support such an inference here, summary judgment is properly granted to the Defendants on the excessive-use-of-force claim.

### B. Eighth Amendment Claims of Deliberate Indifference

Beyond his claims that he was subjected to excessive force by staff, Bone alleges that prison officials were deliberately indifferent towards him in violation of the Eighth Amendment.  Specifically, Bone alleges that Defendant Bastian failed to contact the mental health psychologist once Bone made claims of hearing voices in his head and further exclaimed that those voices were telling him to kill himself. (Doc. 1, complaint at  2, 6-7). Bone claims that instead of contacting the mental health psychologist, he was placed in restraints giving rise to his lawsuit. Id.

Bone alleges that Defendant Knapp was deliberately indifferent to him by allegedly denying him water, food and use of the bathroom as well as failing to loosen restraints. Id. Finally, Bone claims that Defendant Pigos was deliberately indifferent towards him by failing to provide medical care to the wounds on his forearms. Id.

Under the Eighth Amendment, courts recognize that prison officials may not be deliberately indifference to harms or injuries suffered by inmates.

In Beers-Capitol v. Whetzel, 256 F.3d 120 (3d Cir. 2001), the Court of Appeals explained the basic requirements of deliberate indifference claim brought against a prison official under the Eighth Amendment as follows:

> An Eighth Amendment claim against a prison official must meet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind."

Id. at 125 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). Furthermore, in cases involving prison safety or prison conditions, the relevant state of mind "is one of 'deliberate indifference' to inmate health or safety." Id. This deliberate indifference standard "is a subjective standard under Farmer – the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." Id. Thus, "[d]eliberate indifference can be shown when a prison official knows of and disregards an excessive risk to inmate health or safety" Hamilton v. Leavy, 117 F.3d 742, 747 (3d Cir. 1997) Accordingly, "to survive summary judgment on an Eighth Amendment claim asserted under 42 U.S.C. §1983, a plaintiff is required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Davis v. Williams, 354 F. App'x 603, 605-606 (3d Cir. 2009).

As explained in Beers-Capitol, in Eighth Amendment cases based on

allegations of deliberate indifference on the part of prison officials or other supervisory defendants, the Supreme Court has "rejected an objective test for deliberate indifference; instead it looked to what the prison official actually knew rather than what a reasonable official in his position would have known." Id. at 131. Specifically, the Supreme Court "held that 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.'" Id. (quoting Farmer, 511 U.S. at 837). This requirement of actual knowledge on the part of supervisory officials "means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. (quoting Farmer, 511 U.S. at 837).

These principles apply with particular force to Eighth Amendment claims premised upon inadequate medical care. In the medical context, a constitutional violation under the Eighth Amendment occurs only when officials are deliberately indifferent to an inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97, 105 (1976). To establish a violation of his constitutional right to adequate medical care in accordance with this standard, an inmate is required to point to evidence that demonstrates (1) a serious

medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. Clark

v. Doe, 2000 WL 1522855, at *2 (E.D.Pa. Oct. 13, 2000)("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims under §1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference. See e.g. Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')". Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997). Applying this standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received; see, e.g., Ham v. Greer, 269 F. App'x 149 (3d Cir. 2008); James v. Dep't of Corrections, 230 F. App'x 195 (3d. Cir. 2007); Gillespie v. Hogan, 182 F. App'x 103 (3d Cir. 2006), particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services. James, 230 F. App'x. at 197-98 (citations omitted). In short, in the context of the Eighth Amendment, any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional judgment. Inmates of Allegheny County Jail

v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979).

With respect to Defendant, Officer Bastian, Plaintiff alleges that he told Officer Bastian that he was hearing voices that were telling him to kill himself and requested Officer Bastian call Psychology, and instead of calling for mental health for Plaintiff, Bastian returned with Defendant Crawford, who then set Bone up with the false charge of assault.

Officer Bastian submits his own affidavit, under penalty of perjury, in which he states that while he was the G-Block 3rd floor #1 officer on that date and remembers when the incident happened with inmate Bone in the third floor shower, he was in the office at the time of the incident, and did not witness anything, and does not have any additional information concerning Plaintiff's case. (See Doc. 33-1 at 166-167, Affidavit of Randy Bastian).

However, even taking Plaintiff's allegations as true, the record before the Court does not reveal that Plaintiff had a sufficiently serious mental health condition and that Defendant Bastian was deliberately indifferent to such condition.[6] See Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001).

---

[6]While in ambulatory restraints from September 6, 2012 to September 8, 2012, Bone was evaluated both during a 24-hour psychology restraint review and a 48-hour psychology restraint review by Psychology in accordance with the Bureau of Prisons' Program Statement 5566.06, Use of

(continued...)

Likewise, Bone's allegations of deliberate indifference by Defendant Knapp for denying Plaintiff water, food, use of the bathroom, and failure to loosen restraints do not support an Eighth Amendment violation. The record reveals that Defendant Knapp conducted two-hour lieutenant checks on Plaintiff, while in ambulatory restraints, on September 6, 2012, at 2:00 p.m., on September 7, 2012, at 8:00 a.m., and 10:00 a.m., 12:00 p.m. and 2:00 p.m. During each of these two-hour lieutenant restraint checks, it is noted that Bone maintained defiant and aggressive behavior. The record further reveals that at the times that Defendant Knapp completed the two-hour lieutenant checks, the restraint checks of health personnel were being conducted contemporaneously with these times. Notations from the health personnel checks state that the use of toilet was available to Bone; however, the two-hour lieutenant checks reveal that Bone did not use the available toilet. In addition, the health personnel checks confirm that Bone was either provided food or liquid for consumption or his consumption was found to be

---

[6](...continued)

Force and Application of Restraints. (See Doc. 33-1 at 38-40). Collectively, the psychological restraint reviews reported that "this inmate is thinking rationally and purposefully in an effort to avoid responsibility in his actions," "there is little indication [he] has a decompensated mental status," and "mood appeared stable and there was no overt evidence of active psychosis or psychological distress." Id.

adequate. Further, on September 7, 2012 at 7:45 a.m., health personnel arrived to perform restraint checks and noted that "inmate having breakfast when I arrived." Plaintiff offers nothing to refute this. Thus, the record clearly demonstrates that Defendant Knapp did not deprive Plaintiff of any life necessity, in violation of the Eighth Amendment. See Griffin v. Vaughn, 112 F. 3d 703, 709 (3d Cir. 1997) (finding that only conditions that deprive the prisoner of one of life's necessities, such as food, water, clothing, shelter, and medical care are unconstitutional).

Finally, with respect to Defendant, Dr. Pigos, Bone claims that Dr. Pigos was deliberately indifferent by not providing medical care to his wounds on his forearms. Once again, the record belies such allegation. Record evidence demonstrates that Bone's restraints were routinely checked by medical staff to ensure proper fitting. Following the various checks, medical staff noted the following: "patient offered no medical complaints," "mild swelling to right hand," "cuffs moved to proper position on wrists," Inmate counseled to "keep the restraints at the wrists," "Martin chain loosened for comfort," "No signs of trauma or dehydration noted," "Good distal pulses in all Extrem…," "I/M's hands swollen secondary to I/M refusing to keep restraints at the wrist," "Restraints adjusted and moved to wrists," "the inmate has minor abrasions

noted to the wrists," "Restraints again located on IM already open wounds on the forearms," "Attempted to place restraints back at the wrist but IM refused to allow stating they are more comfortable where they are," Restraints: "adequate/good/normal," Inmate use of toilet: "available," and Overall Assessment of Inmate Health: "appears healthy/appears well/fine."

Moreover, the record reveals that on at least eight separate medical restraint checks Bone was instructed to keep the restraints at his wrists. Health checks revealed mild swelling at the hands and scabbed wounds on the forearms were addressed and afterwards Bone was counseled on the proper placement of the restraints for his safety and overall assessment of health. Although Bone was repeatedly counseled on the proper placement of the restraints in order to avoid swelling or injury, he continued to manipulate the restraints by moving them to his forearms, resulting in one health personnel noting "unable to perform wound care, inmate uncooperative."

Following his release from restraints, Plaintiff was seen on one occasion by Dr. Pigos. On September 11, 2012, Plaintiff was examined by Dr. Pigos for a chronic care appointment. His only complaint was the he was hearing voices. At not time did he complain of injury to his arms or request medical care for such.

44

Thus, the Plaintiff has failed to present evidence from which a reasonable jury could conclude that the Defendant Pigos possessed the culpable mental state necessary for Eighth Amendment liability to attach. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d at 346; West v. Keve, 571 F.2d at 161. Indeed, the extent and quality of medical attention that the Defendant Pigos provided Plaintiff precludes a finding of deliberate indifference.

## C. Qualified Immunity

In order to establish a civil rights claim Bone must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone, however, does not guarantee that bone is entitled to recover damages from these public officials. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, 555 U.S. 223 (2009). This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F.Supp.2d 664, 671 (M.D.Pa. 2009)

45

(Conner, J.) (citations omitted).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact'." Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201–02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. Saucier, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 555 U.S. at 232; Saucier, 533 U.S.

at 201–02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)). In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 555 U.S. at 239–40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established

at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299–300 (3d Cir. 2000); Crouse, 668 F.Supp.2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record ... to establish ... a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. See Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010).

In the specific factual context of excessive force claims based upon allegations relating to a prisoner's handcuffing, courts have acknowledged that, in certain instances, summary judgment is entirely appropriate. Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005). With respect to these particular excessive force claims, courts agree that: "In these cases, summary judgment

for an officer who claims qualified immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.'" Id.

Applying these benchmarks, the Court finds that the Defendants are entitled to qualified immunity in this case. The record does not evince anything that would have alerted the Defendants that their actions violated "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Moreover, the duration of Bone's detention in restraints did not fall outside of previously recognized periods of time which did not give rise to constitutional concerns. See, e.g., Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir. 1999) (no Eighth Amendment violation where prisoner handcuffed and shackled for 24 hours); Hunter v. Bledsoe, No. 10–CV–927, 2010 WL 3154963 (M.D.Pa. Aug.9, 2010) (ambulatory restraints used for 24 hours); Holley v. Johnson, No. 08–CCV–629, 2010 WL 2640328 (W.D.Va. June 30, 2010) (ambulatory restraints used for 48 hours); Zimmerman v. Schaeffer, 654 F.Supp.2d 226, 232 (M.D.Pa. 2009) (19 hours or more in restraint chair); Moore v. Miller, No. 7:08CV00614, 2009 WL 113258 (W.D.Va. Jan.15, 2009) (26 hours); Keyes v. O'Brien, No. Civ. A. 7:06CV00437, 2006 WL 2125912 (W.D.Va. July 27,

2006) (no Eighth Amendment violation where prisoner placed in ambulatory restraints for 30 hours); Garraway v. United States, No. 04–CV–01049, 2006 WL 3054606, at *8 (D.Colo. July 24, 2006) (50 hours in ambulatory restraints); Saleh v. Ray, No. Civ. A. 02–3214, 2003 WL 23484639, at * 6 (D.Kan. 2003) (24 hours in ambulatory restraints, no Eighth Amendment violation). Accordingly, Defendants are entitled to qualified immunity from damages in this case.

C. **Claims Based on Disciplinary Proceedings**

The sanctions levied against Bone during his disciplinary hearing, were all imposed as a result of prison misconduct. To the extent that Bone alleges that Defendants Crawford and Saylor fabricated the incident reports issued on September 6, 2012, "mere allegations of falsified [incident] reports, without more, are not enough to state a due process claim." McKeithan v. Beard, 2009 WL 908710, *2 (3d Cir. Apr. 6, 2009); Kimball v. Walters, No. 3:06-0733, 2007 WL 87897, *8 (M.D.Pa. Jan 9, 2007); Bailey v. Beard, 2008 WL 4425588, *10 (M.D.Pa. Sept. 29, 2008) (prisoner does not have a constitutional right to be free from being falsely or wrongfully accused of conduct). "Provided that a prisoner is afforded … due process protections during the disciplinary hearing process, it is well-settled that a claim that a

misconduct report was false, standing alone, does not state a valid Bivens

cause of action." McCullon v. Brouse, No. 3:10-1541, 2011 WL 1398481, *7

(M.D. Pa. Mar. 24, 2011). The record does not evince that Bone was not

afforded the requisite due process protections with respect to these allegedly

falsified incident reports. As such, Defendants are entitled to summary

judgment.

Moreover, the Court finds that any Fifth Amendment due process claim

regarding his disciplinary rehearing is barred under Heck v. Humphrey, 512

U.S. 477 (1994) and Edwards v. Balisok, 520 U.S. 641 (1997).[7] Under some

circumstances, a prisoner may bring a Bivens claim for monetary damages

based on the denial of due process during a prison disciplinary hearing. See

Wolff v. McDonnell, 418 U.S. 539, 554 (1974) (stating that plaintiff's §1983

"damages claim was ... properly before the District Court and required

determination of the validity of the procedures employed for imposing

sanctions, including loss of good time, for flagrant or serious misconduct").

However, such due process claims cannot be brought in a Bivens action

---

[7]While Heck, and Balisok all involved §1983 cases, courts have
extended their holdings to Bivens actions. See Lora-Pena v. F.B.I., 529 F.3d
503, 506 n. 2 (3d Cir. 2008) ("Although Heck involved a §1983 action by a
state prisoner, the reasoning in Heck has been applied to bar Bivens claims"
(citing Williams v. Hill, 74 F.3d 1339, 1341 (D.C. Cir.1996) (per curiam)).

where the claims "necessarily imply the invalidity of the punishment imposed" unless the plaintiff shows that the sanctions have been overturned. See Balisok[8], 520 U.S. at 648 (finding claims for declaratory and monetary relief based on allegations that plaintiff was denied opportunity to present a defense and that hearing officer was biased could not be brought pursuant to §1983); Heck, 512 U .S. at 486-87 ("We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a §1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. §2254."). As the record before us demonstrates, the charges and sanctions stemming

---

[8]In Edwards v. Balisok, the Supreme Court applied the lessons of Heck to a state prisoner action, seeking compensatory and punitive damages, challenging the constitutionality of procedures used in a prison disciplinary proceeding that resulted in the loss of good-time credits, but not necessarily challenging the result and not seeking the restoration of the good-time credits. Again, the Court emphasized that such a claim is not cognizable under §1983 if a favorable outcome would necessarily imply the invalidity of the challenged judgment, there the disciplinary finding and punishment. 520 U.S. at 646-8.

from September 6, 2012 remain valid on Plaintiff's disciplinary record.

## V.   Conclusion

Based upon the undisputed facts of record, Defendants are entitled to summary judgment with respect to Plaintiff's claims of excessive force, deliberate indifference and challenges to his misconduct rehearing. In the alternative, Defendant's request for qualified immunity will be granted with respect to Plaintiff's claim of excessive use of force. Finally, Defendant, "SORT Team Members" will be dismissed pursuant to Rule 4(m) for Plaintiff's failure to properly identify these Defendants and effectuate service within 120 days of the filing of the complaint. See FED.R.CIV.P. 4(m). An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

Dated: **March 31, 2016**
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2014 MEMORANDA\14-1712-01.wpd